**UNITED STATES of America,
Appellee,**

v.

**Cary F. CIMINO, Defendant–Appellant.**

**Docket No. 02–1601.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 2003.

Decided Aug. 25, 2004.

John L. Pollok, Hoffman & Pollok LLP, New York, NY, for Defendant–Appellant.

David C. Esseks, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York, Karl Metzner, Assistant United States Attorney, on the brief), New York, NY, for Appellee.

Before: WALKER, Chief Judge, CALABRESI and CABRANES, Circuit Judges.

WALKER, Chief Judge.

Defendant-appellant Cary Cimino appeals from a judgment of conviction entered against him on October 2, 2002 in the United States District Court for the Southern District of New York (William H. Pauley III, *Judge* ) following his plea of guilty to racketeering activity under 18 U.S.C. § 1962(c) and (d). He argues that the district court erred in declining to sentence him according to the terms of his plea agreement, and that his counsel provided ineffective assistance by encouraging him to accept and then breach that plea agreement. For the reasons that follow, we affirm.

## BACKGROUND

Cimino's conviction stemmed from an investigation into the activities of a company called DMN Capital Investments, Inc. ("DMN"), which held itself out as an investment banking and stock promotion firm. As alleged in the indictment, filed June 7, 2000, the people who operated DMN used a number of criminal tactics, including extortion, threats, bribery, and intimidation, to fraudulently inflate market prices of certain securities they controlled. They then illegally laundered their ill-gotten gains. The indictment charged that Cimino participated in DMN's activities by engaging in racketeering, securities fraud, various forms of conspiracy, and witness tampering. It also charged him with criminal solicitation of murder, based upon his urging another DMN participant, Jeffrey Pokross, to kill a suspected government informant, Warrington Gillet.

Cimino entered into a plea agreement with the Government and, on April 5, 2001,

pled guilty to participation in, and conspiracy to participate in, the affairs of a racketeering enterprise. *See* 18 U.S.C. § 1962(c) & (d). The plea agreement provided that, under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Cimino's total offense level should be 27, with a corresponding Guidelines range of 70 to 87 months' imprisonment. The stipulated offense level of 27 included a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, reflecting Cimino's role in soliciting Gillet's murder, and a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, reflecting the fact that Cimino had pled guilty. The plea agreement did not treat the murder solicitation as a substantive object of the racketeering conspiracy; if it had done so, Cimino's total offense level would have been significantly higher.

The terms of the plea agreement expressly prohibited Cimino from seeking a downward departure from, or any other adjustment to, the stipulated sentencing range. Despite this prohibition, on April 1, 2002, following an extended and ultimately unsuccessful attempt to persuade the Government to offer him a cooperation agreement,[1] Cimino wrote a letter to the district court asking for a "recalculation" of his stipulated Guidelines range. He argued that "the plea agreement ... was not fully knowing and voluntary with respect to punishment." Among the requests made in this letter, Cimino asked the court to reconsider the two-level enhancement for obstruction of justice (based on Cimino's solicitation of Gillet's murder). The following day, Cimino moved for a "downward departure based on the psy-

---

**1.** Under the typical "cooperation agreement," the Government agrees, in return for the defendant's "substantial assistance in the investigation or prosecution of another person who has committed an offense," U.S.S.G. § 5K1.1, to recommend that the district court sentence the defendant below the applicable statutory minimum. *See, e.g., United States v. Resto,* 74 F.3d 22, 25 (2d Cir.1996).

chological conditions that led to his involvement in the misconduct at issue; the severe conditions of his pre-plea detention; and his extraordinary post-arrest rehabilitation and acceptance of responsibility." The Government, in a letter dated April 3, 2002, took the position that the filing of these motions constituted a material breach of the plea agreement, with the effect that the Government was released from its obligations under the agreement. But it indicated that it would only treat the agreement as unenforceable if Cimino persisted in demanding a downward departure and a recalculation of his sentencing range.

The district court heard oral argument on Cimino's motions on two separate occasions. On both occasions, the Government took the position that the plea agreement had been breached (a fact effectively conceded by defense counsel when she acknowledged that the court could "tear . . . up" the agreement and "say it's void," Supp.App. at 141 (Transcript of Hearing, April 5, 2002)), and argued that if Cimino persisted in his efforts to reduce the stipulated sentencing range, the Government would be free to seek, *inter alia*, a higher penalty for the murder solicitation conduct. Undeterred, defense counsel continued to argue that the two-level obstruction of justice enhancement reflected in the plea agreement was unwarranted. To that end, she demanded the opportunity, by way of a *Fatico* hearing,[2] to demonstrate that her client lacked the requisite intent for murder solicitation. The court eventually acceded to her request.

At the *Fatico* hearing, the court heard testimony from Jeffrey Pokross, the person who Cimino allegedly solicited to kill Gillet. Pokross said that he had spoken with Cimino on August 3, 1999, and had taped their conversation. The recording of the conversation, during which Cimino repeatedly suggested that Pokross kill Gillet, was admitted into evidence. Cimino also took the stand at the hearing. He testified that he never intended that Pokross kill Gillet and that his statements during the August 3 conversation had been made in jest.

By memorandum order dated July 25, 2002, the district court rejected Cimino's testimony. Judge Pauley found that Cimino's conduct satisfied all the elements of murder solicitation under New York law, and denied Cimino's application to modify his plea agreement. But he also denied the Government's request that the murder solicitation proved at the hearing be treated as a substantive object of the racketeering conspiracy for sentencing purposes. As to the latter, the court concluded that "the defendant is entitled to the deal he negotiated with the Government." Both parties moved for reconsideration.

Following further briefing, the district court denied Cimino's motion for reconsideration, but granted that of the Government. Judge Pauley found that Cimino had breached the plea agreement by disputing the stipulation concerning the obstruction of justice enhancement and by moving for various sentencing recalculations and downward departures. He determined that although Cimino was still entitled to the three-level downward adjustment for acceptance of responsibility, his base offense level would now be calculated to take account of the murder solicitation conduct, and also would be enhanced by two levels because Cimino had perjured himself at the *Fatico* hearing. The new adjusted offense level was 32, which yielded a Guidelines range of 121 to 151

**2.** The reference is to *United States v. Fatico,* 579 F.2d 707 (2d Cir.1978), which addressed the appropriate standards for pre-sentencing evidentiary hearings.

months' imprisonment. On September 25, 2002, the court sentenced Cimino to 121 months' imprisonment. This appeal followed.

## DISCUSSION

Cimino's primary contention on appeal is that, even though he breached his plea agreement and vigorously resisted its enforcement, the district court nonetheless should have ordered specific performance of that agreement instead of allowing the Government to seek a higher sentence than had been stipulated. This argument is insupportable.

We interpret plea agreements *de novo*. *See United States v. Padilla*, 186 F.3d 136, 139 (2d Cir.1999); *United States v. Rexach*, 896 F.2d 710, 713 (2d Cir.1990). In general, plea agreements are subject to ordinary contract law principles, except that any ambiguity is resolved "strictly against the Government." *See United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996). Cimino does not dispute that he materially breached his plea agreement by seeking a downward departure and challenging the stipulated Guidelines range. Both actions were taken in direct violation of the following term of the agreement:

> The parties agree that neither a downward nor an upward departure from the Sentencing range set forth [in this agreement] is warranted. Accordingly, neither party will seek such a departure or seek any adjustment not set forth herein.

Cimino argues, however, that his breach did not free the Government from its obligations under the agreement.

Our precedent weighs against Cimino's position. When the Government breaches a plea agreement, the defendant is entitled to either withdraw his plea or have his agreement specifically performed. *See, e.g., United States v. Lawlor*, 168 F.3d 633, 638 (2d Cir.1999). Conversely, when the defendant is the party in breach, the Government is at least entitled to specific performance of the plea agreement, *see United States v. Alexander*, 869 F.2d 91, 95 (2d Cir.1989), and we have assumed (without squarely holding) that if the Government instead wants to treat the agreement as unenforceable, it has a right to do that as well. *See id.* (holding that specific performance was proper remedy for defendant's breach, but suggesting that rescission would have been available before sentencing); *United States v. Merritt*, 988 F.2d 1298, 1313 (2d Cir.1993) ("a defendant who materially breaches a plea agreement may not claim its benefits"); *see also United States v. Gregory*, 245 F.3d 160, 164 (2d Cir.2001) (holding that Government was justified in revoking cooperation agreement upon defendant's breach of that agreement); *United States v. El–Gheur*, 201 F.3d 90, 93–94 (2d Cir.2000) (holding that defendant's breach of cooperation agreement absolved Government of obligation to move for downward departure pursuant to U.S.S.G. § 5K1.1).

Cimino urges us to reject the logic of *Alexander* and *Merritt* and to hold that, as a matter of law, the Government is never entitled to escape its obligations under a plea agreement. To support his argument, he seizes upon our statement in *Lawlor* that " '[t]he remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement.' " 168 F.3d at 638 (quoting *United States v. Brody*, 808 F.2d 944, 947 (2d Cir.1986)). Cimino reads this to mean that if a defendant declines to withdraw his plea, the only remedy available to the Government is specific performance. But the statement quoted from *Lawlor* plainly pertains to situations in which the Government, not the defendant,

breaches the agreement. In fact, fairly read, *Lawlor* supports the Government's position; the counterpart to a defendant's right to plea withdrawal following the Government's breach is the Government's right to treat the agreement as unenforceable following the defendant's breach. *See Alexander*, 869 F.2d at 95 (Government is entitled to remedies similar to those available to defendant).

■ Freeing the Government from its obligations under the plea agreement in these circumstances is consistent not only with our precedent but also with the approach taken by our sister circuits. *See, e.g., United States v. Kelly*, 337 F.3d 897, 901 (7th Cir.2003) ("[A] defendant's substantial breach of an unambiguous term of a plea agreement frees the government to rescind the deal."); *United States v. Sandoval–Lopez*, 122 F.3d 797, 800 (9th Cir. 1997) ("Where a defendant has breached a plea agreement, courts have found the government to be free from its obligations."); *United States v. Ballis*, 28 F.3d 1399, 1409 (5th Cir.1994) ("[I]f a defendant materially breaches his commitments under a plea agreement, the government is released from its obligations under that compact . . . ."); *United States v. West*, 2 F.3d 66, 69–70 (4th Cir.1993) (defendant's breach of plea agreement "relieves the government of its obligation to conform to the agree-ment's terms"). The fairness of this principle is demonstrated by the facts of this case. If the Government's only remedy were to seek specific performance of the plea agreement (a remedy the Government here pursued until Cimino forced it to litigate the murder solicitation issue), a defendant would be free to do as Cimino did in this case—mount a full-fledged attack on the terms of the agreement, in contravention of his undertaking not to do so—without fear of consequence. The only risk the defendant would face would be enforcement of the very bargain he struck in the first place. Such an interpretation of the law would create perverse incentives, defeat the policies that undergird plea bargaining, *see Santobello v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), and place an unwarranted burden on both the Government and the district courts, *see, e.g., United States v. Whitlow*, 287 F.3d 638, 640 (7th Cir.2002) (specific performance of agreement following defendant's breach is a "poor remedy" where the Government has already wasted substantial resources responding to defendant's challenges). Accordingly, we hold that, when a defendant breaches his plea agreement, the Government has the option to either seek specific performance of the agreement or treat it as unenforceable.[3]

---

**3.** The Government here did not seek to treat the entire plea agreement as unenforceable; it simply sought a higher sentence than had been stipulated in the agreement. Presumably, the Government could have brought a new indictment and demanded that Cimino either plead guilty a second time or go to trial. *See Ballis*, 28 F.3d at 1409. But we know of no authority suggesting that the Government *must* start from scratch rather than follow the more modest route of seeking a higher sentence where, as here, the defendant wants to keep his original guilty plea intact and retains the benefit of a three-level downward adjustment for acceptance of responsibility. *Cf. United States v. Bowe*, 257 F.3d 336, 345–46 (4th Cir.2001) (releasing Government of its obligation not to seek higher sentence where defendant breached plea agreement by requesting downward departure); *United States v. Wells*, 262 F.3d 455, 467 (5th Cir.2001) ("[A] defendant should realize breaching a plea agreement is an event that could cause the prosecutor to withdraw leniency with respect to the sentencing recommendation previously given."). *The situation would be quite different if Cimino, having breached, wished to withdraw his guilty plea and go to trial. Under ordinary contract principles, the Government would then have to decide whether to seek specific perform-*

. Our holding does not dispose of the matter entirely, however, because Cimino also argues that the terms of the plea agreement itself preclude the Government from treating it as unenforceable. Cimino points to the clause of his agreement which states that if "the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this agreement," the Government may seek a denial of the adjustment for acceptance of responsibility. He argues that this provision evidences the parties' intent that *only* the conduct described therein would give the Government the right to deviate from the agreement (and then only insofar as the acceptance of responsibility adjustment is concerned).

Cimino's argument on this point is not persuasive. The above-quoted provision gives the Government the right to contest a stipulated adjustment if the defendant, without technically breaching the terms of the agreement, has engaged in either subsequently discovered obstruction of justice or criminal conduct not addressed in the plea agreement. It says nothing about the remedies available to the parties following a material breach of the agreement's express terms. Those remedies are supplied instead by general principles of contract law, tempered by rules that account for the peculiar nature of plea agreements. *See Alexander*, 869 F.2d at 95; *cf.* *1–95–CV–553–P1 v. 1–95–CV–553–D1*, 75 F.3d 135, 136–37 (2d Cir.1996) (defendant may

not seek damages for breach of plea agreement). As explained above, our precedent supports the view that cancellation,[4] a traditional remedy for breach of contract, is available to the Government when the defendant breaches his plea agreement.

Finally, Cimino contends that his counsel provided ineffective assistance in two respects: by trying to prove that Cimino lacked the requisite intent for murder solicitation under New York law, *see* New York Penal Law § 100.10, and by encouraging Cimino to accept the plea agreement in the first place. As to the first, the argument appears to be that counsel should have known that the evidence at the *Fatico* hearing would convince the court of Cimino's guilt of solicitation, and that her tactic of arguing that Cimino's statements to Pokross were made in jest or out of a playful attempt at bravado was bound to fail. As to the second, Cimino seems to be suggesting that counsel erroneously advised him that he would likely obtain a cooperation agreement if he accepted the plea agreement.

Although defense counsel's strategy in pursuing the murder solicitation issue arguably falls within the realm of well-nigh unimpeachable defense tactics, *see Loliscio v. Goord*, 263 F.3d 178, 195 (2d Cir.2001) (even "risky, unorthodox or downright ill-advised" tactical decisions do not rise to the level of ineffective assistance (internal quotation marks omitted)), we decline to make that determination on this appeal. As the Supreme Court has recently noted,

---

ance of the original contract agreement, despite the breach, or to cancel the original agreement, because of the breach.

4. We have previously referred to the Government's right to be released from its obligations under a plea agreement as a "right to rescind." *See, e.g., Alexander*, 869 F.2d at 95. The parties refer to it as a right to "repudiate" the agreement. *See* Br. for the United

States, at 38; Br. for Defendant–Appellant, at 30. As the Fourth Circuit has recently explained, however, the proper term to describe one party's decision to put an end to an agreement following the other party's breach is "cancellation." *See United States v. Scruggs*, 356 F.3d 539, 545 (4th Cir.2004) (citing Restatement (Second) of Contracts § 283 & cmt. a (1981)).

counsel's tactical decisions are best evaluated by the district court in the first instance. *See Massaro v. United States,* 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003) ("in most cases a motion brought under [18 U.S.C.] § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance"). Because Cimino's contention that his counsel erred in persuading him to accept the plea agreement also depends in large part on an inquiry into defense counsel's motives, *see Massaro,* 538 U.S. at 504, 123 S.Ct. 1690, it, too, should be considered in the first instance by the district court.

The question remains, then, whether the proper course is to remand Cimino's ineffective assistance claim to the district court or, alternatively, direct that the claim be asserted in a collateral proceeding under 28 U.S.C. § 2255. *See United States v. Doe,* 365 F.3d 150, 152–53 (2d Cir.2004); *United States v. Leone,* 215 F.3d 253, 256 (2d Cir.2000). Because we find that there are no factors here favoring a remand, and because "judicial economy is served by requiring the district court to await the defendant's collateral section 2255 motion before addressing his ineffectiveness claim," *Doe,* 365 F.3d at 154, we dismiss Cimino's ineffective assistance claim without prejudice to his right to pursue it in a motion brought pursuant to 28 U.S.C. § 2255 before the district court.

### BLAKELY ISSUES

In the interim between oral argument and our decision in this case, the Supreme Court issued its decision in *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Counsel for Cimino promptly filed a letter pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, informing the court of the *Blakely* decision and of its potential impact on the United States Sentencing Guidelines generally and on Cimino's sentence in particular. We have recently held, however, that, until the Supreme Court instructs otherwise (as it will have the opportunity to do when it considers the arguments in *United States v. Booker,* No. 04–104, and *United States v. Fanfan,* No. 04–105), we will assume that *Blakely* does not affect the Guidelines and, accordingly, that all sentences imposed in accordance with the Guidelines are valid. *See United States v. Mincey,* 380 F.3d 102, 105–06, No. 03–1419, 2004 WL 1794717, at *3 (2d Cir. Aug.12, 2004).

Notwithstanding the foregoing, the mandate in this case will be held pending the Supreme Court's decision in *Booker* and *Fanfan.* Should any party believe there is a need for the district court to exercise jurisdiction prior to the Supreme Court's decision, it may file a motion seeking issuance of the mandate in whole or in part. Although any petition for rehearing should be filed in the normal course pursuant to Rule 40 of the Federal Rules of Appellate Procedure, the court will not reconsider those portions of its opinion that address the defendant's sentence until after the Supreme Court's decision in *Booker* and *Fanfan.* In that regard, the parties will have until 14 days following the Supreme Court's decision to file supplemental petitions for rehearing in light of *Booker* and *Fanfan.*

### CONCLUSION

The judgment of conviction is AFFIRMED.